NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.,**
*Plaintiff-Cross Appellant,*

v.

**CANON INC. AND CANON U.S.A., INC.,**
*Defendants,*

**and**

**FUJI PHOTO FILM CO. LTD. (NOW FUJIFILM CORPORATION), FUJI PHOTO FILM U.S.A. INC. (NOW FUJIFILM NORTH AMERICA CORPORATION), AND FUJIFILM AMERICA INC. (NOW FUJIFILM HOLDINGS AMERICA CORPORATION),**
*Defendants-Appellants.*

———————————

2009-1052, 2010-1137, -1140

———————————

Appeals from the United States District Court for the District of Delaware case no. 03-CV-0241, Judge Joseph J. Farnan, Jr.

———————————

Decided: January 10, 2011

———————————

RONALD J. SCHUTZ, Robins, Kaplan, Miller & Ciresi L.L.P, of Minneapolis, Minnesota, argued for plaintiff-cross appellant. With him on the brief were JAKE M. HOLDREITH, BECKY R. THORSON, SETH A. NORTHROP and TREVOR J. FOSTER. Of counsel was DAVID P. SWENSON.

STEVEN J. ROUTH, Orrick, Herrington & Sutcliffe LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were STEIN A. JENSEN; and E. JOSHUA ROSENKRANZ and ALEX V. CHACHKES, of New York, New York; and WILLIAM H. WRIGHT, of Los Angeles, California.

---

Before DYK, MAYER, and MOORE, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* MOORE.

DYK, *Circuit Judge*.

Fuji Photo Film Co. Ltd., Fuji Photo Film U.S.A. Inc., and Fujifilm America Inc. (collectively "Fuji") appeal a judgment that Fuji infringed four patents owned by St. Clair Intellectual Property Consultants, Inc. ("St. Clair"). These are United States Patent Nos. 5,138,459 ("'459 patent"), 6,094,219 ("'219 patent"), 6,233,010 ("'010 patent"), and 6,323,899 ("'899 patent"). We hold that the district court erred in construing the asserted claims, and, accordingly, we reverse the judgment of infringement.

BACKGROUND

In 2003, St. Clair sued Fujifilm and seven other digital camera manufacturers for infringing the patents-in-suit. All four patents share a common specification and cover electronic "still video cameras" that save digital photographs in user-determined memory formats for use

on personal computers ("PCs"). Primarily at issue was claim 16 of the '459 patent, which provides in relevant part:

> A process for storing an electronically sensed video image comprising the steps of: . . . recording in selectable addressible memory means at least one of a plurality of different digital output data format codes where each of said plurality of output data format codes corresponds respectively to one of a like *plurality of different data formats for different types of computer apparatus.*

'459 Patent col.15 l.23–col.16 l.4 (emphasis added). St. Clair also asserted dependant claim 17 of the '459 patent. Claim 10 of the '219 patent similarly provides the identical "plurality of different data formats for different types of computer apparatus" language. The parties disputed whether this phrase was limited to formats related to different computer architectures (e.g., IBM or Apple PCs) or if it could also include formats related to different computer applications (e.g., software that can run GIFF or PICT). Fuji contended that the "different types of computer apparatus" language refers to different types of architecture (i.e., different operating systems combined with hardware) such as IBM and Apple PCs, and not to different applications that can run on multiple types of architectures. In its August 31, 2004, *Markman* order, the district court rejected Fuji's construction, construing the disputed claim term as follows:

> (1) a 'data format' is the arrangement of digital data in a file including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV, and (2) a 'computer apparatus' is a *computer and any operating system or application*

*software loaded on the computer*.  Computer apparatus are 'different types' within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same.

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, No. 03-241, slip op. at 9–10, 2004 WL 1941340, at *4 (D. Del. Aug. 31, 2004) (emphasis added).  Under the district court's construction, the accused Fuji cameras infringed claims 16 and 17 of the '459 patent and claim 10 of the '219 patent because the cameras can save pictures under multiple file formats accessible by various software programs running on both IBM and Apple PCs.  Fuji's cameras did not infringe under Fuji's proposed construction of the claims.

A similar dispute arose with respect to claim 1 of the '010 patent and claims 1 and 3 of the '899 patent.  Though those claims use somewhat different language, the district court concluded that "the parties agree[d]" to construe the asserted claims consistently across all four patents, with the result that the Fuji cameras also infringed those claims.  *St. Clair*, 2004 WL 1941340, at *4.  As St. Clair's expert acknowledged at trial, however, none of the accused Fuji cameras has "different formats for different types of computer apparatus where the different types of computer apparatus are IBM on the one hand and Apple on the other."  J.A. 7629.

During the *Markman* proceedings, the district court also addressed a separate claim construction issue—whether the claim term "plurality of different data formats" included movie formats.  This limitation or variations thereof appear in claim 16 of the '459 patent; claims 1, 10, and 16 of the '219 patent; claim 1 of the '010 patent; and claims 1 and 3 of the '899 patent.  St. Clair contended

that movie formats were covered under the district court's construction of "data formats" in claim 16. Fuji disagreed, arguing that the invention only covered "still pictures" and not movies. The district court's *Markman* order found that "neither the specification nor the language of the claims impose[d] a still picture limitation." *St. Clair*, 2004 WL 1941340, at *7. Under this construction, the accused Fuji cameras, which had both a still picture and movie mode, were found to satisfy the "plurality of different data formats" limitation of the asserted claims.

In October 2004, under the district court's claim construction, a jury found that each of the asserted claims was valid and infringed by Fuji's products. In September 2005, the district court denied Fuji's motion for judgment as a matter of law. However, on June 19, 2006, before the entry of judgment, the case was stayed. In 2008, the district court lifted the stay and entered judgment on the 2004 verdicts. On November 19, 2009, the court denied St. Clair's motion for a new trial on damages and entered an Amended Judgment. Fuji timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

The parties agree that if Fuji's construction of the claims is correct, there is no infringement. Claim construction is a question of law, which we review de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc).

I

Under the district court's construction of "computer apparatus," claims 16 and 17 of the '459 patent and claim 10 of the '219 patent encompass all permutations of hardware, operating systems, and "different application software." *St. Clair*, 2004 WL 1941340, at *3. As St.

Clair's expert stated during trial, a data format would be "for" a different type of computer apparatus "if it's possible to have a computer that can read that format and another computer that cannot." J.A. 7636.

In light of the claim language and the ubiquitous and consistent correspondence between data formats and computer architectures throughout the specification and prosecution history, we hold that the term "computer apparatus" refers to computer architecture. Each data format code "corresponds respectively to one of a like plurality of different data formats for different types of computer apparatus" only if "each data format" corresponds on a one-to-one basis to a different type of computer architecture (e.g., in the way that GIFF corresponds to IBM and PICT corresponds to Apple). Under this construction, there is no infringement of claims 16 and 17 of the '459 patent or claim 10 of the '219 patent.

*Claim language.* On its face, the term "computer apparatus" appears to refer to computer architecture. The phrase "different data formats for different types of computer apparatus" appears to refer to data formats that correspond to particular computer architectures.

*Specification.* In 1990, the problem the inventors sought to solve was one of computer architecture incompatibility, not data format incompatibility. Back then, the proprietary nature of PC development—under which IBM and Apple PCs were manufactured with different and incompatible processors, operating systems, and memory schemes—meant that digital images formatted for use on an IBM PC could not be used on an Apple PC without converting that data. This presented a computer architecture incompatibility problem.

Here, the specification uniformly describes the solution to this problem as involving the selection of data

formats that correspond to particular computer architectures. We have held that the consistent use of a claim term in the specification suggests that the scope of a claim is limited. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005). The specification expressly allows a user to select data formats for use with particular computer architectures, citing IBM and Apple PCs as exemplar architectures. The Abstract provides in relevant part:

> An electronic still camera . . . [that] selectively formats the compressed digital image *to a compatible format for either the IBM Personal Computer and related architectures or the Apple Macintosh PC architecture as selected by the operator* so that the digital image can be directly read into most word processing, desktop publishing, and data base software packages including means for executing the appropriate selected decompression algorithm.

'459 Patent, at [57] (emphasis added). When a user selects a format, he makes a decision based on the desired architecture—not a particular data format. Moreover, the specification describes the two preferred data formats, GIFF and PICT, consistently as being "PC compatible formats" that are respectively associated with IBM and Apple PCs. *See, e.g.*, '459 Patent col.10 ll.9–10; col.11 ll.32–44.

The "format switch," labeled (17) in the figures, was the inventive solution for allowing users to select between different data formats. '459 Patent col.11 ll.32–36. Using this switch, a user can select "IBM" to choose the preferred GIFF format corresponding to IBM PCs; "Apple" to choose the preferred PICT format corresponding to Apple PCs; or "Other" for architectures other than IBM and

Apple. '459 Patent col.4 l.68–col.5 l.4 & col.12 ll.53–60. Figures depicting "format switch (17)" consistently show a one-to-one correspondence between computer architecture and format code. For example, Figure 2A shows three modes for "format signals (57)": "Apple = 00"; "IBM = 01"; "Other = 10." '459 Patent col.3 ll.8–11; *see also id.* fig.6 (showing control panel logic with two format choices: IBM or Apple); *id.* fig.14A (listing options for format switch (17) as "Apple V1"; "IBM V2"; and "Other PC V3"); *id.* fig.14B (showing how format switch (17) controls the selection of an "image data" format that corresponds with the desired PC format and memory format for the selected PC architecture). These figures thus disclose how the data format codes must correspond to computer architecture.

***Prosecution history.*** In construing claim terms, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

During prosecution, the inventors described the problem to be solved as one of computer architecture incompatibility:

> Applicants' claimed improvement . . . solves a long felt need by providing a low cost and efficient solution for achieving flexible and selectable data format compat[i]bility between the output of an electronic still camera and the input to any one of a *plurality of personal computer-type apparatus.* . . . [T]he prior art . . . has required relatively expensive and cumbersome, multi-step conversion processes to achieve input data format compat[i]bility with any one of a *plurality of types of personal computers manufactured* by different

companies, *e.g. IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc. . . .*

As is well known to those skilled in the information processing and computer arts, *different types of personal computers, e.g. IBM PC, Apple Macintosh, DEC, Sun Microsystems, etc.* each have widely *different, non-compatible* input/output data formats, line I/O discipline and instruction command sets and therefore the input/output data formats for one type [of] apparatus is *not usable with or inputable into another manufacturer's apparatus. Since there is no industry standard generally recognized by all PC manufacturers*, . . . machines of one manufacturer cannot exchange data or be interconnected with or communicate with machines of another manufacturer. Therefore, *data formatted for one such PC-type machine must be converted to be compatible with another machine.*

J.A. 1557–59 (emphases added). In other words, the invention "solve[d] a long felt need" by allowing data format compatibility with a "plurality of types of personal computers manufactured by different [personal computer] companies, IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc." J.A. 1558. Similarly thereafter, in the words of the inventors, the patents-in-suit "solve[d] a long felt need":

[B]efore Applicants' improvement there has not been commercially available a simple apparatus or process which permits the electronic still camera to *designate or select* one of a plurality of digital data formats as the camera is being utilized *to ensure direct data format compat[i]bility for input*

*into a selected model personal computer apparatus.*

J.A. 1557, 1559–60 (emphases added). In sum, to address the architecture incompatibility problem, the applicants created a camera that could output a plurality of formats for computers "manufactured by different companies, e.g. IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc." J.A. 1558. Only by construing "different types of computer apparatus" to mean "different types of computer architecture" can we remain faithful to the invention actually described in the prosecution history.

Because the accused Fuji cameras output data formats that are not tailored to specific computer architectures, Fuji does not infringe claims 16 and 17 of the '459 patent or claim 10 of the '219 patent.

## II

However, St. Clair contends that the asserted claims of the '010 and '899 patents use different claim language than the asserted claims of the '459 and '219 patents, and that those claims should be construed differently. Though the district court found that "the parties agree[d]" to construe the asserted claims consistently across all four patents, *St. Clair*, 2004 WL 1941340, at *4, the record seems to support St. Clair's contention that it neither agreed nor disagreed to affirmatively use claim 16 as a representative claim.

Nonetheless, we conclude that the asserted claims of the '010 and '899 patents are limited to selecting formats for different types of computer architecture. Each patent shares the same specification and uses similar, and often identical, terminology. St. Clair's brief also recognizes that the asserted claims of the other patents include "variations of [the] language" used in claim 16. Plaintiff-

Cross Appellant's Br. 24. These "variations" are as follows:

- '010 Patent, Claim 1: "formatting said digital image signal in *one of a plurality of computer formats*." '010 Patent col.12 ll.59–60 (emphasis added).

- '899 Patent, Claim 1: "formatting the digital image signal in *one of a plurality of computer image file formats*." '899 Patent col.12 ll.48–49 (emphasis added).

- '899 Patent, Claim 3: "formatting the digital image signal in the selected *computer image file format*." '899 Patent col.12 ll.60–61 (emphasis added).

The fact that the specification describes only a single invention, and does not differentiate between the scope of claims using very different language, suggests that the limitations in claim 1 of the '010 patent and claims 1 and 3 of the '899 patent should have the same meaning as the "different data formats for different types of computer apparatus" language in claims 16 and 17 of the '459 patent and claim 10 of the '219 patent.

Fuji's construction is also supported by remarks made by the examiner during reexamination.[1]  Reexamination

---

[1]    St. Clair argues that Fuji waived consideration of the reexamination materials because it failed to raise in its opening brief the issue of the district court striking the reexamination materials from the record. *See, e.g., In re Cygnus Telecomm. Tech. LLC*, 536 F.3d 1343, 1356 (Fed. Cir. 2008).  However, Fuji clearly relied on the examiner's statements in its briefs in this court, and this court can take judicial notice of the reexamination record.  *See Standard Havens Prods., Inc. v. Gencor Indus. Inc.*, 897

statements "are relevant prosecution history when interpreting claims." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir. 1988). The reexamination procedure serves an important role in providing a district court with an "expert view of the PTO." *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983). In this case, the reexamination occurred against the backdrop of an earlier *Sony* litigation involving the same claim terms. *See St. Clair Intellectual Prop. Consultants, Inc. v. Sony Corp.*, No. 01-557, 2002 WL 31051605 (D. Del. Sept. 3, 2002). In *Sony*, the district court defined the term "data format" to mean "the arrangement of digital data in a file, including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV." *Id.* at *2. The court construed the term "computer apparatus" to mean "a computer and any operating system or application software loaded on the computer." *Id.* at *3. During reexamination, five different examiners, including three different Supervisory Patent Examiners, rejected the *Sony* court's interpretation of the claim language. In addition to concluding that claims 16 and 17 of the '459 patent and claim 10 of the '219 patent were limited to different data formats for different types of computer architecture, the examiners, rejecting the *Sony* court's construction, concluded that the "computer architecture" construction also applied to the '010 and '899 patents:

- **'010 Patent**: "[T]he claim limitation '. . . formatting said digital image signal in one of a plurality of computer formats' is interpreted *to mean format-*

---

F.2d 511, 514 n.3 (Fed. Cir. 1990) (taking notice of the "adjudicative fact" of an office action on reexamination rejecting the patentee's claims).

*ting the image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.* Office Action in Ex Parte Reexamination of '010 Patent, J.A. 9584.

- **'899 Patent**: "[T]he claim limitation 'formatting the digital image signal in one of a plurality of computer image file formats' is interpreted *to mean formatting the image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.*" Office Action in Ex Parte Reexamination of '899 Patent, J.A. 9543.

Because an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight.

St. Clair contends, however, that the examiner actually accepted its construction of the claims in connection with the examination of the '899 patent. St. Clair's argument relies on the fact that the examiner acknowledged that at least one data format, the TIF image file format, was "platform independent and could be used in either an IBM PC/Clone or Apple Macintosh computer." J.A. 9544. This statement suggested to St. Clair that "the examiner did not believe that the claims were limited to formats that could only be read by one architecture." Plaintff-Cross Appellant's Br. 49. This argument does not withstand scrutiny. The examiner was responding to a contention that the Kühberger prior art was anticipatory. While the examiner's reasons for refusing to find anticipation were not entirely clear, the examiner plainly found that the patents-in-suit did something different because they did not disclose selecting among different data

formats. In doing so, he did not suggest that the non-platform-specific TIF format was the type of format that the claims were designed to accommodate. And the examiner thereafter made clear that the language of the '459 patent meant

> the image file formats provided for selection (PICT II or GIFF) are in one-to-one correspondence with a particular type of computer system (Apple Macintosh or IBM PC) respectively . . . . In other words, [the applicants] DO NOT provide selecting between various subspecies of the same computer species (e.g. Species 1–A, Species 1–B, or Species 1–C), rather [the applicants] DO provide selecting between various computer species (e.g. Species 1, Species 2, or Species etc.).

J.A. 9612. The examiner explicitly rejected the *Sony* claim construction on which the district court relied and applied this construction not just to the '459 and '219 patents, but also the '010 and '899 patents, specifically stating that, with respect to the '899 and '010 patents, the "[e]xaminer is in agreement with the comments made by the Requester . . . that . . . a very different interpretation tha[n] that adopted by the [*Sony*] court must be made." J.A. 9542, 9583.

We also find that, although St. Clair submitted "Comments on Statement for Reasons for Patentability and/or Conformation" disagreeing with the examiner's construction, St. Clair's comments "do[ ] not, indeed cannot, change the examiner's Reasons for Allowance." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2003); *see also* 37 C.F.R. § 1.104(e) ("Failure by the examiner to respond to any statement commenting on reasons for allowance does not give rise to any implication.").

We conclude that the similar terms in the '010 and '899 patents should be construed as limited to different computer architectures.

## III

A second claim construction issue with respect to claim 16 concerns the "plurality of data formats" limitation. St. Clair argues that "different data formats" are not limited to "still" pictures, but include moving images. While the camera must produce a still image, the district court construed the term "data formats" to also include a movie mode. Because certain Fuji cameras have both a still picture data format and a movie data format, under the district court's construction, these cameras would satisfy the "plurality of different data formats" limitation. The district court pointed to two references in the specification to show that the data formats contemplated by the inventors included movie formats: (1) a reference to camera circuitry that allows "for approximately 20 images to be captured in a one second period," '459 Patent col.8 ll.35–37; and (2) references to the MPEG and DVI compression techniques, which were designed to compress sequential images, *id.* col.10 ll.49–59.

However, we agree with Fuji's argument that the use of the words "still" and "image" throughout the patents-in-suit limits the claims to a single image or picture. *See, e.g., id.* fig.2; col.1 ll.7–25. The word "still" is included in the title, the Abstracts of the '459 and '219 patents, the Summary of the Invention, and throughout the specification. In contrast, the word movie does not appear once in the specification or the prosecution history. In addition, all the terms describing formatting issues refer to images. *See, e.g.*, '219 Patent col.12 ll.48–49 (formatting "*each* digitized captured *image*") (emphases added). Though the specification describes an invention able to capture "ap-

proximately 20 *images . . .* in a one second period," this appears to refer to a mode of capturing multiple, but singular still images in sequence. '459 Patent col.8 ll.35–37 (emphasis added); *see also id.* col.2 ll.32–34 ("An additional object of this invention [is] to . . . rapidly capture a series of *images* automatically as well as *singularly*.") (emphases added).

Finally, we note that, even if the MPEG and DVI compression techniques referenced in the specification are designed for movie formats, these ambiguous references cannot overcome the explicit limitation to still picture formats elsewhere in the specification. Accordingly, we hold that movie formats do not satisfy the "plurality of data formats" limitation.

## IV

Under the correct claim construction, judgment as a matter of law of non-infringement should have been granted. In view of this disposition, there is no need to address issues concerning damages.

## REVERSED

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.,**
*Plaintiff-Cross Appellant,*

v.

**CANON INC. AND CANON U.S.A., INC.,**
*Defendants,*

AND

**FUJI PHOTO FILM CO. LTD. (NOW FUJIFILM CORPORATION), FUJI PHOTO FILM U.S.A. INC. (NOW FUJIFILM NORTH AMERICA CORPORATION), AND FUJIFILM AMERICA INC. (NOW FUJIFILM HOLDINGS AMERICA CORPORATION),**
*Defendants-Appellants.*

———————————

2009-1052, 2010-1137, -1140

———————————

Appeals from the United States District Court for the District of Delaware case No. 03-CV-0241, Judge Joseph J. Farnan, Jr.

———————————

MOORE, *Circuit Judge*, dissenting.

Respectfully, I dissent. I would affirm the district court's construction of all but one claim term and affirm the judgment of infringement in favor of the patentee. While I agree with the district court's construction under a de novo standard of review, I note that were any deference given, this would surely be a case in which the lower court construction should be affirmed. Because my colleagues deviate from the plain meaning of these claim terms, I respectfully dissent.

## I.

With regard to claim 16 of the '459 patent and elsewhere where this term appears,[1] the majority holds that the term "plurality of different data formats" is limited to still images – that it does not include multiple or moving images. The district court held that the plain meaning of this language included both still image file formats and moving (movie) image file formats. The district court held that the plain and ordinary meaning of "data format" is "the arrangement of digital data in a file, including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV." I see no error in the district court's construction (and Fujifilm does NOT appeal that construction). The term "plurality of different data formats" is broad and the plain meaning would certainly include movie file formats such as MPEG. Moreover, the specification EXPRESSLY names MPEG and DVI compression (used for movies) as "an alternative em-

---

[1] This term or a similar one appears in claim 16 of the '459 patent, claims 1, 10 and 16 of the '219 patent, claim 1 of the '010 patent and claims 1 and 3 of the '899 patent. All four patents have the same specification.

bodiment of the present invention." '459 patent col.10 ll.46-59; *see also id.* col.8 ll.35-37.

The majority bases its narrowing of the plain meaning on the repeated use of the words still and image in the patent. Even though still appears often, the specification also lists MPEG and DVI as an alternative embodiment. Unlike *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001), or other such cases, there is no narrowing language in this specification to justify narrowing the claim scope. Here, the claim language at issue is "plurality of different data formats." The plain meaning of this language includes MPEG (which all parties agree is a data format), and the specification discloses MPEG/DVI as an alternative embodiment of the invention. I believe the district court's construction was correct and I would affirm the determination of infringement of this claim.

## II.

Fujifilm also appealed the construction of the following terms: "a plurality of computer image file formats" in claims 1 and 3 of the '899 patent; "plurality of computer formats" in claim 1 of the '010 patent; "a plurality of different data file formats for different types of computer apparatus" in claim 10 in the '219 patent; "a plurality of different data formats for different types of information handling systems [apparatus]" in claims 1 [and 16] of the '219 patent; and "plurality of different data formats for different types of computer apparatus" in claim 16 of the '459 patent. Based on the district court's construction, a jury found infringement.

As an initial matter, the majority erred because it claims that "the district court concluded that the parties

agreed to construe the claims consistently across all four patents." Maj. Op. at 4, 10. The record shows no such agreement and no such statement by the district court. The district court stated that "the parties agree that the terms and phrases of the various patents should be construed consistently." Read in context, the district court was explaining that the parties agreed to construe *similar* terms and phrases consistently, not entire claims or dissimilar phrases. The district court gives an example of phrases that the parties agreed should have the same construction: "plurality of different data formats for different types of computer apparatus" and "a plurality of different data formats for different types of information handling systems." I can agree that these phrases are similar.

I cannot agree, however, that a "plurality of different data formats for different types of computer apparatus" is similar to "a plurality of computer file formats," and St. Clair clearly argues that they should be construed differently. Appellee's Br. 24. I believe therefore that St. Clair is entitled to have this court independently construe each term. For me, at least, such a process leads to different constructions.

For claims which contain the language "a plurality of different file formats for different types of computer apparatus" or "a plurality of different data formats for different types of information handling systems," I agree with the majority, these terms refer to a data format for use with a particular architecture. The term "plurality of different file formats" includes all the different files formats discussed above and the term "for different types of computer apparatus" implicates the different computer architectures. Therefore these claims are limited to different file formats for different architectures by their plain language.

This "for different types of computer apparatus" limitation, however, does not appear in the claims at issue in the '010 and '899 patents. Those claims recite formatting a digital image signal "in one of a plurality of computer formats" and "in one of a plurality of computer image file formats." Because the inventors omitted the "for different types of computer apparatus" limitation, the plain language of those claims is broader. In my opinion, neither the specification nor the prosecution history supports importing such a limitation into these claims.

I do not agree that the specification includes clearly narrowing language as in *SciMed*. On the contrary, the specification explains that JPEG "was developed in 1985 in response to the lack of interoperability between image and processing equipment due to numerous proprietary standards held by each manufacturer." '459 patent col.10 ll.33-39. In addition to its express disclosure of the platform-independent JPEG and MPEG standards, the specification discusses PICT and GIF formats. As Fujifilm's own expert explained, although PICT files were "most often" used by Apples and "some applications" on IBMs could read GIFs, those file types were not exclusively limited to particular architectures. He further explained that, at the time of filing, some applications for both Apples and IBMs could read those file formats.

I also do not agree with the majority's reliance on the reexamination history because St. Clair did not clearly disavow claim scope during reexamination. On the contrary, during reexamination of the '010 and '889 patents, St. Clair traversed the examiner's narrow claim construction prior to overcoming the asserted art. During reexamination of the '459 and '219 patents, the examiner confirmed all claims on the first office action. Hence, St. Clair argued nothing in these reexaminations that could be construed as

a disavowal. In fact, in a post-allowance submission, St. Clair made clear its view that these terms were not limited in the manner the majority now does.

Thus, I conclude that the majority erred in its construction of a "plurality of computer image formats." First, it erred in not construing that term separately from the for different architectures term. Second, it erred by importing a limitation regarding computer architecture into a claim which had no such limitation. As I believe the district court construction of these file format terms is correct, I would affirm the judgment of infringement.